**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| CUSHION TECHNOLOGIES, LLC | § | |
| | § | |
| vs. | § | CASE NO. 2:06-CV-347 |
| | § | |
| ADIDAS SALOMON NORTH | § | |
| AMERICA, INC., ET AL. | § | |

**MEMORANDUM OPINION AND ORDER**

**1.     Introduction**

In this case, Cushion Technologies, LLC ("Cushion") contends that the defendants infringe various claims of U.S. Patent Nos. 5,060,401 and 5,279,051, each of which is subject to a reexamination certificate.[1] The patents are not related, but do share common subject matter, *e.g.* methods and articles for cushioning footwear. The '401 patent was filed on February 12, 1990, and the '051 patent was filed on January 31, 1992. The '401 patent issued on October 29, 1991, and the '051 patent issued on January 18, 1994. The reexamination certificate for the '401 patent issued on October 7, 2003, and the reexamination certificate for the '051 patent issued on August 26, 2003. The '051 patent is subject to a terminal disclaimer that makes its term coextensive with the term of the '401 patent.

Ian Whatley is the inventor of each patent-in-suit. Mr. Whatley previously asserted the patents-in-suit against Nike before the Honorable James A. Redden, U.S. District Judge for the District of Oregon. *See Ian Whatley v. Nike, Inc.*, No. 3:98-963 (D. Or. Aug. 4, 1998). In the Nike litigation, the term "cushioning" was the only term presented to the court for construction by the

---

[1] Each patent is currently the subject of a subsequent reexamination proceeding as well. *See* Brief of Defendants at 1.

parties, and Judge Redden construed the term "cushioning" to mean "to reduce vertical impact forces." *See Ian Whatley v. Nike, Inc.*, No. 3:98-963, slip op. At 3 (D. Or. June 25, 2002).[2]  Since the Nike litigation, reexamination certificates have issued for each patent-in-suit, and Mr. Whatley has assigned the patents-in-suit to Cushion.

**2.     Background of the Technology**

The invention is directed to footwear that is designed to absorb some of the forces caused by the wearer of the footwear when landing or moving quickly during walking, running, or other sports activities. '401 patent at 2:45-49. The footwear is provided with an upper portion, an outsole, and a midsole. The midsole is positioned between the upper portion of the footwear and footwear's outsole, and typically includes cushioning. '401 patent at 1:35-42. In accordance with the invention, the midsole may also include an external cushioning spring. The cushioning spring is formed from an angled strip of resilient material, which is affixed to the footwear to absorb a portion of the vertical force imparted to the footwear by its wearer. '401 patent at 1:42-43, 1:51-55.

The cushioning springs are optimally placed at the heel of the wearer and/or under the wearer's metatarsal heads. '401 patent at 2:64-66. Such locations provide the most efficient protection from reaction forces with the ground, and for energy return to the wearer. Additionally, placement of the spring on the surface of the sole, midsole, and upper portions of the footwear provides a stabilizing effect on the gait of the wearer, and helps to prevent the wearer's foot from rolling to the outside or inside of the footwear during use. '401 patent at 2:66-3:3. Such a

---

[2]     This case was on referral to the Honorable Donald C. Ashmanskas, U.S. Magistrate Judge for the District of Oregon. Judge Redden overruled Nike's objections to Judge Ashmanskas' *Markman* order, and adopted his *Markman* order without change. The Nike litigation was thereafter dismissed with prejudice on May 23, 2005, in light of the parties' settlement agreement. *See Ian Whatley v. Nike, Inc.*, No. 3:98-963 (D. Or. May 23, 2005).

configuration may aid persons suffering from pronation. '401 patent at 3:4-5. The cushioning springs can take the form of various geometrical shapes, *e.g.* a circle, and can be made from different materials to vary the cushioning attributes of the footwear. For example, the cushioning attributes of the footwear can be adjusted by placing springs of differing resilience at two or more locations around the footwear's perimeter, as appropriate. *See* '401 patent at 3:15-19; '051 patent, Figures.

**3.     General Principles Governing Claim Construction**

"A claim in a patent provides the metes and bounds of the right which the patent confers on the patentee to exclude others from making, using or selling the protected invention." *Burke, Inc. v. Bruno Indep. Living Aids, Inc.*, 183 F.3d 1334, 1340 (Fed. Cir. 1999). Claim construction is an issue of law for the court to decide. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970-71 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996).

To ascertain the meaning of claims, the court looks to three primary sources: the claims, the specification, and the prosecution history. *Markman*, 52 F.3d at 979. Under the patent law, the specification must contain a written description of the invention that enables one of ordinary skill in the art to make and use the invention. A patent's claims must be read in view of the specification, of which they are a part. *Id.* For claim construction purposes, the description may act as a sort of dictionary, which explains the invention and may define terms used in the claims. *Id.* "One purpose for examining the specification is to determine if the patentee has limited the scope of the claims." *Watts v. XL Sys., Inc.*, 232 F.3d 877, 882 (Fed. Cir. 2000).

Nonetheless, it is the function of the claims, not the specification, to set forth the limits of the patentee's claims. Otherwise, there would be no need for claims. *SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985) (en banc). The patentee is free to be his own

lexicographer, but any special definition given to a word must be clearly set forth in the specification. *Intellicall, Inc. v. Phonometrics*, 952 F.2d 1384, 1388 (Fed. Cir. 1992). And, although the specification may indicate that certain embodiments are preferred, particular embodiments appearing in the specification will not be read into the claims when the claim language is broader than the embodiments. *Electro Med. Sys., S.A. v. Cooper Life Scis., Inc.*, 34 F.3d 1048, 1054 (Fed. Cir. 1994).

This court's claim construction decision must be informed by the Federal Circuit's decision in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (*en banc*). In *Phillips*, the court set forth several guideposts that courts should follow when construing claims. In particular, the court reiterated that "the *claims* of a patent define the invention to which the patentee is entitled the right to exclude." *Id.* at 1312 (emphasis added) (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). To that end, the words used in a claim are generally given their ordinary and customary meaning. *Id.* The ordinary and customary meaning of a claim term "is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, *i.e.* as of the effective filing date of the patent application." *Id.* at 1313. This principle of patent law flows naturally from the recognition that inventors are usually persons who are skilled in the field of the invention. The patent is addressed to and intended to be read by others skilled in the particular art. *Id.*

The primacy of claim terms notwithstanding, *Phillips* made clear that "the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.* Although the claims themselves may provide guidance as to the meaning of particular terms,

those terms are part of "a fully integrated written instrument." *Id.* at 1315 (quoting *Markman*, 52 F.3d at 978). Thus, the *Phillips* court emphasized the specification as being the primary basis for construing the claims. *Id.* at 1314-17. As the Supreme Court stated long ago, "in case of doubt or ambiguity it is proper in all cases to refer back to the descriptive portions of the specification to aid in solving the doubt or in ascertaining the true intent and meaning of the language employed in the claims." *Bates v. Coe*, 98 U.S. 31, 38 (1878). In addressing the role of the specification, the *Phillips* court quoted with approval its earlier observations from *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998):

> Ultimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim. The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.

Consequently, *Phillips* emphasized the important role the specification plays in the claim construction process.

The prosecution history also continues to play an important role in claim interpretation. The prosecution history helps to demonstrate how the inventor and the PTO understood the patent. *Phillips*, 415 F.3d at 1317. Because the file history, however, "represents an ongoing negotiation between the PTO and the applicant," it may lack the clarity of the specification and thus be less useful in claim construction proceedings. *Id.* Nevertheless, the prosecution history is intrinsic evidence. That evidence is relevant to the determination of how the inventor understood the invention and whether the inventor limited the invention during prosecution by narrowing the scope of the claims.

*Phillips* rejected any claim construction approach that sacrificed the intrinsic record in favor

of extrinsic evidence, such as dictionary definitions or expert testimony. The *en banc* court condemned the suggestion made by *Tex. Digital Sys., Inc. v. Telegenix, Inc.*, 308 F.3d 1193 (Fed. Cir. 2002), that a court should discern the ordinary meaning of the claim terms (through dictionaries or otherwise) before resorting to the specification for certain limited purposes. *Id*. at 1319-24. The approach suggested by *Tex. Digital*–the assignment of a limited role to the specification–was rejected as inconsistent with decisions holding the specification to be the best guide to the meaning of a disputed term. *Id.* at 1320-21. According to *Phillips*, reliance on dictionary definitions at the expense of the specification had the effect of "focus[ing] the inquiry on the abstract meaning of words rather than on the meaning of the claim terms within the context of the patent." *Id*. at 1321. *Phillips* emphasized that the patent system is based on the proposition that the claims cover only the invented subject matter. *Id*. What is described in the claims flows from the statutory requirement imposed on the patentee to describe and particularly claim what he or she has invented. *Id.* The definitions found in dictionaries, however, often flow from the editors' objective of assembling all of the possible definitions for a word. *Id.* at 1321-22.

*Phillips* does not preclude all uses of dictionaries in claim construction proceedings. Instead, the court assigned dictionaries a role subordinate to the intrinsic record. In doing so, the court emphasized that claim construction issues are not resolved by any magic formula. The court did not impose any particular sequence of steps for a court to follow when it considers disputed claim language. *Id*. at 1323-25. Rather, *Phillips* held that a court must attach the appropriate weight to the intrinsic sources offered in support of a proposed claim construction, bearing in mind the general rule that the claims measure the scope of the patent grant.

**4.    Discussion**

    **1.    cushioning spring**

The defendants contend that the term "spring" should be construed as "a device that absorbs force and returns that force and that is not a damper, stabilizer or a reinforcing device," and that the term "cushioning spring" should be construed to mean "a spring that produces a greater shock absorbing effect and greater energy return to the wearer than provided by the midsole alone and that is not primarily a stabilizing or reinforcing device." Cushion contends that the term "cushioning" means "to reduce vertical impact forces," and that no construction of the term "spring" is required.

The disagreement between the parties' positions focuses on whether a spring can include a damper, stabilizer, or other reinforcing device. The defendants assert that Mr. Whatley expressly disclaimed these embodiments during prosecution of the reexamination proceedings. Cushion contends that, while a spring is not a damper, stabilizer, or reinforcing device as defined by the prior art, a spring may inherently serve to dampen, stabilize, and reinforce. Cushion therefore argues that it is improper to exclude such inherent functionality from the definition of a spring. Cushion's arguments are persuasive.

The defendants' prosecution estoppel argument is best illustrated with reference to the Riggs prior art reference (U.S. Patent No. 4,638,577). During the reexamination proceeding for each patent-in-suit, the Examiner asserted the Riggs reference against Whatley's claimed invention. In each proceeding, the Examiner contended that Riggs anticipated Whatley's "spring" design, or

alternatively rendered his design obvious. *See, e.g.*, Brief of Plaintiff, Exhibit 7[3] at 2; Exhibit 11[4] at 14. In response to the Examiner's rejection, Whatley stated that "[n]owhere in the disclosure [of Riggs] does the term 'spring' appear or any reference to the storing of energy or return of that energy to the wearer. The only function discussed is shock damping and rigid stability . . . ." Brief of Defendants at 11 (quoting the '051 appeal brief). The defendants contend that this statement was material to the allowance of the claims at issue and therefore serves as a disclaimer.

The court rejects the defendants' estoppel arguments. First, Whatley argued that other elements, such as the spring's external location, distinguished his invention over the prior art. *See, e.g.* Brief of Plaintiff, Exhibit 11 at 15. The Board of Patent Appeals and Interferences (the "Board") agreed. *See* Brief of Plaintiff, Exhibit 5[5] at 11-12; Exhibit 6[6] at 13-14 (stating "[a]lthough the [E]xaminer contends otherwise, we do not consider the resilient insert material provided in the open ended angled slots of the various embodiments of Riggs to be 'external' springs within the meaning of 'external' as that term is used in the appealed claims." *Id.* at 13). Second, read as a whole, Whatley argued that the prior art failed to teach a spring, and instead taught only stabilizers

---

[3] The plaintiff's Exhibit 7 is the Examiner's Answer on appeal for the '051 patent's reexamination proceedings. This answer was filed on September 27, 2001.

[4] The plaintiff's Exhibit 11 is the Appellant's Brief on appeal for the '401 reexamination proceeding. This brief was filed on August 4, 2001.

[5] The plaintiff's Exhibit 5 is the Decision on Appeal for the '051 patent. The Examiner incorporated the Board's Decision on Appeal into his reason's for allowance for the '051 reexamination certificate. *See* CUS8030 (the Notice of Intent to Issue Ex Parte Reexamination Certificate, mailed on April 2, 2003.)

[6] The plaintiff's Exhibit 6 is the Decision of Appeal for the '401 patent. The Examiner incorporated the Board's Decision on Appeal into his reason's for allowance for the '401 reexamination certificate. *See* CUS7219 (the Notice of Intent to Issue Ex Parte Reexamination Certificate, mailed on May 8, 2003).

and dampeners.

In support of its position, Cushion references Whatley's written description, which indicates that the spring serves to stabilize the gait of the wearer, and absorbs some of the forces caused by the wearer. *See* '401 patent at 3:1-2; '051 patent at 4:3-7; 4:26-28. Cushion also cites to Whatley's statements in the prosecution history, which define a "spring [as] a device that absorbs and returns energy." *See* Brief of Plaintiff, Exhibit 11 at 5; Exhibit 12 at 6. For the above reasons, in addition to Judge Redden's previous construction of the term "cushioning," the court construes the term "cushioning spring" to mean "a device that absorbs vertical force and returns a portion of that vertical force during the time in which the wearer's foot leaves the ground."[7]

**2.     external**

Cushion's proposed construction of this term is "on the outside surfaces of the upper, midsole, and/or outsole." The defendants contend that the term "external" must be construed with reference to the "cushioning spring." Their proposed construction is "a cushioning spring fixed on an external side wall that does not entirely replace a portion of a normal midsole across the entire width or length of a shoe and that is located only on one side (or at one end) of the shoe, *i.e.*, does not extend across the entire width or length of a midsole."

In his written description of the '051 patent, Whatley defined the term "external" as referring to

> a spring element that does not entirely replace a portion of a normal midsole across the entire width or length of a show, as do those internal spring items described in the art cited above. Rather, the element is located only on one side (or at one end) of a shoe and may

---

[7] At the *Markman* hearing, the parties agreed to the temporal component of the court's claim construction, *i.e.* "during the time in which the wearer's foot leaves the ground."

> extend inward from the shoe perimeter to some extent (*e.g.*, about 2-3 cm).

'051 patent at 2:63-3:1. In its decisions, the Board stated

> the adjective "external" is a term of relation, such that "external," "outside" or "exterior"[] of what must be considered in determining the meaning of the phrase "external cushioning spring." In the present case, the spring is external relative to the surfaces of the claimed components (the upper, midsole and/or outsole) it is associated with, so that the spring is located on the outside surfaces of said components. This interpretation is consistent with both the description and objectives of appellant's invention.

Brief of Plaintiff, Exhibit 5 at 11; Exhibit 6 at 13. As such, the Board acknowledged that Whatley's definition of this term in the '051 specification was meant to distinguish his invention from springs that were contained within midsole portion of prior art shoes. As such, Whatley's definition does not necessarily limit his invention as the defendants contend, *e.g.* by excluding a spring that extends around the midsole across the entire length or width of the midsole.[8]

For the reasons discussed above, the court construes the term "external" to mean "outside the surfaces of the upper, midsole, and/or outsole."

### 3. angled strip

Cushion's proposed construction is "a thin piece of material having a bended portion." Some of the defendants propose a construction of "a long, narrow piece of material of uniform width having only two ends and a bended portion which acts to absorb a portion of a vertical force applied to the two ends of that bended portion." The remaining defendants wish to add "with a gap between the two ends containing less resilient material" to this proposed construction.

---

[8] Whether this embodiment is enabled or supported by Whatley's written description is not addressed herein.

The term "angled" is defined in each patent as "used in a broad sense . . . to encompass any shape of material having a bended portion. . . . [I]t includes use of an angled strip, as shown in the drawings, having a less resilient material filling in any gap between the two ends of the bended portion to give the appearance of an unbent strip of material." '401 patent at 1:56-63; *see* '051 patent at 2:39- 57.  The drawings show various angled strips, all of which are formed from a thin band of material that has a bended portion.  *See* '401 patent Figures; '051 patent Figures.  In view of the intrinsic record, the court construes the term "angled strip" to mean "a thin band of material having a bended portion."

### 4.     external side wall of the midsole / outsole

The defendants' proposed construction for this term is "an outer side surface of the midsole / outsole, visible from a side of the shoe if not for the presence of the spring, that connects the outer perimeters of the upper and lower surface of the midsole / outsole and lies in the same general vertical plane as the corresponding outer side surfaces of the midsole /outsole and the upper." Cushion contends that no construction of this term is required.

In its decision, the Board stated that "[a]ppellant's claims expressly define the 'external side wall' of the outsole as being *between* the perimeters (*i.e.*, 'edges') of the upper and lower surfaces of the outsole."  Brief of Plaintiff, Exhibit 5 at 6-7; Exhibit 6 at 6.  Consistent with the court's construction of the term "external," as discussed above, the court construes the term "external side wall of the midsole / outsole" to mean "an outer side surface of the midsole / outsole."

### 5.     one end / the other end

The defendants' proposed construction of this terms is "the tip or edge that marks either extremity of the angled strip." Cushion contends that no construction of this term is necessary. During the *Markman* hearing, counsel for the defense acknowledged an inconsistency between their proposed construction of this term and of the term "angled strip" and a claimed embodiment, *i.e.* where the angled strip is in the form of an "O." *See* '051 patent, claim 12. Upon questioning by the court, counsel suggested that the claimed circle was "problematic" to their proposed constructions, which attempt to limit an angled strip to one that has two ends with a tip or edge that marks either extremity. The court accordingly rejects the defendants' proposed limitations. The terms "one end" and "the other end" do not need construction.

### 6.     fixed on [a] sidewall

The defendants' proposed construction of this term is "attached to, not merely abutting, an 'external side wall.'" Cushion contends that no construction of this term is necessary. Cushion argues that the defendants proposed construction excludes the indirect attachment of a spring to a sidewall, which is a claimed embodiment. *See* Brief of Plaintiff at 29. The court agrees, and construes this term to mean "held in place on a sidewall."

### 7.     to bend between said ends / to bend between one end and said other end

The defendants contend that the term "to bend between said ends" means "to push 'said ends' closer together," and that the term "to bend between one end and said other end" means "to push 'said one end and said other end' closer together." Cushion contends that no construction of these terms is necessary. The court agrees with Cushion and concludes that these terms do not require construction.

**8.** **extension**

The defendants' proposed construction of this term is "a portion of the external cushioning spring extending from the angled strip." Cushion contends that no construction of this term is required. The court agrees with Cushion, and concludes that no construction of this term is necessary.

**5.** **Conclusion**

The court adopts the above constructions. The parties are ordered that they may not refer, directly or indirectly, to each other's claim construction positions in the presence of the jury. Likewise, the parties are ordered to refrain from mentioning any portion of this opinion, other than the actual definitions adopted by the court, in the presence of the jury. Any reference to claim construction proceedings is limited to informing the jury of the constructions adopted by the court.

SIGNED this 5th day of February, 2008.

_____
CHARLES EVERINGHAM IV
UNITED STATES MAGISTRATE JUDGE